## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:14-CV-291-RJ

| | |
|---|---|
| WILLIAM D. SCOTT, JR., | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| v. | )      O R D E R |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross-motions for judgment on the pleadings

[DE-17, -19] pursuant to Fed. R. Civ. P. 12(c). Claimant William D. Scott, Jr. ("Claimant") filed

this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his

applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental

Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending

motions are ripe for adjudication. Having carefully reviewed the administrative record and the

motions and memoranda submitted by the parties, Claimant's Motion for Judgment on the Pleadings

[DE-17] is DENIED, Defendant's Motion for Judgment on the Pleadings [DE-19] is ALLOWED,

and the final decision of the Commissioner is upheld.

## I. STATEMENT OF THE CASE

Claimant previously filed applications for a period of disability, DIB, and SSI on July 9,

2009, alleging disability beginning April 12, 2006. (R. 102). The Commissioner denied benefits

(R. 102-18), and the court affirmed the Commissioner's decision, *Scott v. Colvin*, No. 5:12-CV-614-

D, 2014 WL 672929 (E.D.N.C. Feb. 20, 2014) (unpublished). Claimant then protectively filed new

applications for a period of disability, DIB, and SSI on April 1 and 5, 2011, respectively, alleging disability beginning March 10, 2007. (R. 63, 260-61). Both claims were denied initially and upon reconsideration. (R. 63, 119-80). A hearing before the Administrative Law Judge ("ALJ") was held on November 19, 2012, at which Claimant, represented by counsel, and a vocational expert ("VE") appeared and testified. (R. 63, 74-98). On December 12, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 60-73). The Appeals Council granted Claimant's request for review on February 27, 2014, finding that the ALJ's decision was not supported by substantial evidence because the ALJ applied the incorrect Medical-Vocational Rule. (R. 12-16). However, the Appeals Council ultimately adopted the ALJ's findings and conclusions in all other respects and, applying the correct Medical-Vocational Rule, determined Claimant was not disabled and denied Claimant's application for benefits. (R. 3-11). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla

2

... and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of

3

functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3), 416.920a(e)(3).

In this case, Claimant alleges the following errors: (1) the ALJ improperly evaluated the medical opinion evidence; (2) the ALJ improperly evaluated Claimant's credibility; (3) the ALJ improperly evaluated Claimant's RFC; and (4) the Appeals Council failed to consider a favorable Medicaid decision. Pl.'s Mem. [DE-18] at 1, 10-19.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant has not engaged in substantial gainful activity since the alleged onset date. (R. 65). Next, the ALJ determined Claimant has the following severe impairments: degenerative disc disease/degenerative joint disease of the cervical spine, mood disorder, depression, residual effects of bulging disc, residual effects of left shoulder fracture, and residual effects of thoracic spine fracture. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 66). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild restrictions in his activities of daily living, moderate difficulties in social functioning, and concentration, persistence and pace, with no episodes of decompensation,

4

which have been of an extended duration. (R. 66-67).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] with the following limitations: occasionally climb stairs or ramps; occasionally bend, balance, stoop, crawl, kneel or crouch; never climb ropes, ladders or scaffolds; occasionally reach overhead bilaterally; perform frequent, not constant, fingering, grasping and holding with his bilateral upper extremities; avoid occupations with hazardous machinery and vibrations; simple, routine and repetitive tasks; low production occupation requiring no complex decision making, constant change, or dealing with crisis situations; frequent, not constant, contact with co-workers and the general public; and a sit/stand option, defined as the ability to sit or stand while performing the employer's task and remaining on task. (R. 68-71). In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 69). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work. (R. 71). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 71-72).

## B. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing he was 50 years old and living with his wife. (R. 80). Claimant sees his primary care physician Dr. Ferguson monthly, and Dr. Ferguson has

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

5

prescribed Oxycodone, Xanax, Lyrica, Gabapentin, and some other unspecified medications for Claimant. (R. 79-80). Since 2011, Claimant has sustained a thoracic fracture and lower back injury. (R. 82). He denied lifting heavy items. *Id.* Claimant has not undergone back surgery, indicating he could obtain a referral but could not have the surgery due to lack of money. *Id.* In 2012, Claimant began experiencing worsening, acute pain in his upper middle back and could not move. (R. 84). Claimant's wife drove him to the hospital in Chapel Hill and while waiting to see the doctor his blood pressure elevated and he almost went into cardiac arrest. *Id.* Claimant was told to request a referral to UNC Neurology from his primary care doctor. (R. 85). Claimant obtained the referral and had an appointment for a nerve conduction study, which required payment of $375.00. *Id.* However, two days prior to the appointment, Claimant was told it was cancelled because he had no insurance and was self-pay. *Id.*

Claimant experiences sharp pain and swelling in his hands and uses them very little. (R. 86). His small fingers overlap, his fingers are swollen to twice their normal size in the mornings, and he has to work his fingers for 30 to 45 minutes to be able to use them. (R. 85-86). Claimant can use a fork and knife to cut meat, but gets twinges in his hands and drops things often. (R. 86). Approximately four months prior to the hearing, Claimant began experiencing a burning sensation in his feet, which affects his ability to walk and sleep. (R. 81-82, 87, 89). Claimant was advised the pain in his feet was caused by nerves shutting down, but he did not have money for treatment. (R. 89). In November 2011, Claimant attempted to receive pain management treatment at the RPK Pain Center, but was told to continue seeing Dr. Ferguson for pain management. (R. 87-88). Claimant is unsure whether there are side effects from his medications because when he experiences the burning sensation in his feet he is "not mentally there at all." (R. 88). Claimant's pain affects his

6

ability to focus at times. (R. 88-89). Claimant also experiences worsening pain in his neck. (R. 88-89). Claimant had been wearing a soft collar around his neck for three years but was advised by his doctor to stop wearing it. (R. 89). Claimant can turn his head some from right to left and up and down, but his neck cracks when he moves it. (R. 90). Claimant's neck and body lean to the right when he is seated and he cannot hold his head straight upright. (R. 91). Claimant was advised he needed an operation involving titanium plates to correct his neck problem, which would cost more than $300,000.00. (R. 90).

Claimant cannot dress himself or cook and requires assistance from his wife. (R. 81). He spends his days lying on the couch sleeping and watching television. *Id.* Claimant drives some, but his wife drove the 15 to 20 minutes to the administrative hearing. (R. 82-83). Claimant does no housework or shopping. (R. 83). Claimant has two dogs that he lets outside, but he does not go outside with them. *Id.* Claimant has no hobbies, and he used to deer hunt but can no longer do so. (R. 84).

## C. Vocational Expert's Testimony at the Administrative Hearing

Ashley Johnson testified as a VE at the administrative hearing. (R. 52-60). After the VE's testimony regarding Claimant's past work experience as an automobile mechanic, the ALJ asked the VE to assume a hypothetical individual of Claimant's age, education, and work background who is able to perform light exertional work with the following limitations: occasional climbing of stairs or ramps; occasional bending, balancing, stooping, crawling, kneeling, or crouching; no climbing ropes, ladders, or scaffolds; occasional overhead reaching bilaterally; frequent, not constant, contact with coworkers and the general public; no hazardous machinery and vibrations; simple, routine, repetitive tasks in a low production occupation, which would require no conflicts, decision making,

7

constant change, or dealing with crisis situations; and a sit stand option, i.e., the individual would work in an occupation where he or she could sit and/or stand while performing the employer's tasks. (R. 92-93). The ALJ inquired as to whether the hypothetical individual could perform Claimant's past work, and the VE responded in the negative. (R. 93). However, the VE opined that such an individual could perform the occupations of shipping-receiving weigher, Dictionary of Occupational Titles ("DOT") number 222.387-074, light, unskilled, SVP of 2, and 620 positions available in North Carolina and 18,000 positions available in the United States, which reflects a 75 percent reduction to reflect the number of employers that would allow for a chair or stool to be used at the work station; small parts assembler, DOT number 706.684-022, light, unskilled, SVP of 2, and 1,700 positions available in North Carolina and 17,000 positions available in the United States, which also reflects a 75 percent reduction to accommodate the sit/stand option; and electronics worker, DOT number 726.687-010, light, SVP of 2, and 260 positions available in North Carolina and 9,600 positions available in the United States that would accommodate the sit/stand option. *Id.* The ALJ added the limitation of frequent, not constant, fingering, grasping, and holding bilaterally, and the VE indicated the limitation did not eliminate the listed occupations. (R. 93-94). The VE indicated the limitation of only occasional reaching in all directions would eliminate the positions of small parts assembler and electronics worker, and the VE could not offer any alternatives. (R. 94). The VE also testified that no jobs would be available to an individual who would miss four or more days of work per month. *Id.*

Claimant's counsel asked the VE whether adding the limitation of occasional fingering to the other limitations in the ALJ's first and second hypotheticals would change the result, and the VE indicated it would eliminate each of the three positions listed. *Id.* Counsel next asked if adding to

8

the first hypothetical the additional limitation of only occasional movement of the neck from right to left and back left to right, only occasional elevation of the chin, and never looking down to the extent of bringing the chin to the neck would change the result. (R. 95). The VE indicated the DOT does not address movement of the neck for the occupations listed, but in the VE's experience as she has seen the jobs performed, a limitation of only occasionally moving the head back and forth and up and down would eliminate the three positions listed and all other light work. *Id.* Finally, counsel asked whether an individual who, due to the effects of chronic pain and or pain medications, was only able to maintain concentration or pace for an hour at a time without requiring either a rest break or some redirection from a supervisor was employable, and the VE responded in the negative. *Id.*

The VE indicated her testimony was consistent with the DOT with the exception of her testimony regarding neck movement; absences, breaks, or time off task; simple, repetitive, routine tasks; low production; complex decision making; work place changes; overhead reaching; and a sit/stand option. *Id.* In the areas not addressed by the DOT, the VE utilized her knowledge, education, experience, and training in providing testimony. (R. 95-96).

## V. DISCUSSION

### A. Medical Opinion Evidence

Claimant contends the ALJ improperly evaluated the medical opinion evidence. Pl.'s Mem. [DE-18] at 10-13. Specifically, Claimant argues that the ALJ's reasons for rejecting the medical opinions of Claimant's treating physician are not supported by the record and the ALJ failed to weigh a consultative examiner's opinion regarding the effect of Claimant's mental impairments. *Id.* The Commissioner contends that the ALJ sufficiently explained the reasons for discounting the treating physician's opinion and substantial evidence supports the ALJ's decision in this regard. Def.'s

9

(2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (unpublished), he must nevertheless explain the weight afforded such opinions. *See* S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996); S.S.R. 96-6p, 1996 WL 374180, at *1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8. "In most cases, the ALJ's failure to consider a physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand." *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (unpublished) (citations omitted). However, "[i]n some cases, the failure of an ALJ to explicitly state the weight given to a medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the decision and any grounds for discounting it are reasonably articulated." *Bryant v. Colvin*, No. 5:11-CV-648-D, 2013 WL 3455736, at *5 (E.D.N.C. July 9, 2013) (unpublished) (citations & quotations omitted).

## 1.    Treating Physician's Opinions

On March 14, 2011, Claimant's treating physician Dr. Ferguson issued an opinion letter based on his medical evaluation of Claimant. (R. 336-39). Dr. Ferguson indicated Claimant had been his patient for more than five years and Claimant was "on an extended medical leave secondary to severe degenerative disc disease of his cervical spine, which has left him with limited usage of his upper extremities." (R. 336). Dr. Ferguson stated Claimant's "symptoms of degenerative disc

11

disease are manifested by upper extremity weakness, numbness, loss of feeling in his hands and severe pain." *Id.* He noted Claimant's "radicu[l]opathy induced intense pain secondary to nerve entrapment of the cervical spine affecting the brachial plexus." *Id.* Dr. Ferguson also noted Claimant's increasing depression and opined that "[t]hese facts, coupled with the necessity to place him on heavy narcotic to alleviate his pain symptoms, make it unlikely he will ever return to the work force." *Id.*

In support of his opinion, Dr. Ferguson cited Claimant's past medical history of degenerative disc disease of the cervical spine, spinal stenosis of C3-4 and C6-7, peripheral neuropathy of upper extremities, emphysema, anxiety disorder, insomnia, hypertension, and status post pancreatitis and that Claimant suffers from muscle weakness to both hands, arthritic pain in his lower back, knees, and hips, shortness of breath with minimal exertion, and chronic fatigue exacerbated by usage of opiates. (R. 337). He also cited the following objective evidence: a physical examination of Claimant on February 23, 2011, which noted Claimant was wearing a neck brace and right-wrist brace, his neck was stiff with minimal movement inducing pain and he turned his body to look right or left, he had limited range of motion with lower back pain on forward flexion greater than 30 degrees, grip strength on the right of 2/5 and on the left of 3/5, and thenar muscle wasting of the right hand; a November 30, 2009 MRI of Claimant's cervical spine showed multilevel degenerative disc disease and bulging in the cervical spine, most prominent within the spinal canal at C3-4 and at C6-7, resulting in some areas of acquired narrowing of the spinal canal, lateral recesses, and neural foramina. (R. 337-38). Dr. Ferguson indicated he was treating Claimant's degenerative disc disease of the cervical spine, spinal stenosis, and peripheral neuropathy of the upper extremities with Percocet, Celebrex, and Neurontin, his anxiety disorder with Xanax, his insomnia with Atarax, and

12

his hypertension with Lisinopril. (R. 338-39). In summary, Dr. Ferguson concluded he believed

Claimant was unable to work due to his disc disease of the cervical spine and radiculopathy of both

hands. (R. 339).

> Mr. William Scott is in my opinion **100% disabled**. He has not [sic] able to
> continue working as a mechanic in any capacity because of his severe pain from
> degenerative disc disease to cervical spine and associated upper extremity
> radiculopathy. His upper extremity neuropathy and numbness are a direct result of
> spinal stenosis of the C3-5 and C6-7 nerve compression. He suffers from shortness
> of breath with exertion secondary to smoking greater than 30 years.

> He has limited ability to exercise because of pain and this has subsequently
> caused his depression to aggravate his symptoms of loss of self worth. His inability
> to work has likewise caused him to become very depressed and anxious. He feels,
> and understandably so, that he has abandoned his family causing his wife to be the
> sole breadwinner.

> His degenerative disc and joint disease is progressive and will keep him from
> participating in any type of physical labor. He is presently beginning water aerobics,
> and has engaged in weigh[t] lifting to increase his body strength, which will help his
> range of motion. However, his medical problems are progressive and debilitating
> and will most likely not be corrected with surgery. **He will never be able to return
> to the work force secondary to the degenerative disc disease of his cervical spine
> coupled with his radiculopathy of both bands.**

> I recommend he be immediately **classified as 100% disabled**.

*Id.* (emphasis in the original).

On August 25, 2012, Dr. Ferguson completed a form questionnaire regarding Claimant's

cervical spine disorders. (R. 475). Dr. Ferguson indicated, by check mark, that Claimant had the

following findings on examination or testing: neuro-anatomic distribution of pain, limitation of

motion of the cervical spine, motor loss (muscle weakness or atrophy with associated muscle

weakness), and severe burning or painful dysethesia. *Id.* Dr. Ferguson indicated, by circling his

answer, that Claimant's pain was moderate and that he could work for two hours a day, stand for 15

13

minutes at one time, sit for 30 minutes at one time, lift 20 pounds occasionally, lift 10 pounds frequently, occasionally rotate his neck to the right and left and elevate his chin, and never bring his chin to his neck. *Id.* Dr. Ferguson wrote in the comment section that Claimant suffers from "severe upper extremity radicular pain due to degenerative disc disease to the cervical spine and that, while he exhibits no muscle wasting, he is "unable to turn his head without penetrating muscle upper extremity discomfort." *Id.*

The ALJ afforded Dr. Ferguson's opinions little weight because the issue of disability is reserved to the Commissioner and the opinions are inconsistent with examination findings, treatment notes, and admitted activities of daily living. (R. 70). With respect to Dr. Ferguson's treatment notes, the ALJ stated as follows:

> Treatment records from July 2011 reveal largely unremarkable physical examination findings such as full ranges of motion in his spine and extremities, along with a normal neurological examination (Exhibit B4F). The claimant sought treatment for neck pain in February 2012. Examination findings revealed reduced ranges of motion in his neck and lumbar spine due to discomfort, but full strength findings in both his upper and lower extremities. In addition, the claimant exhibited no significant instability with his gait. No significant edema or muscle atrophy were noted (Exhibit B7F).

(R. 69). There are occasional notations in Dr. Ferguson's treatment notes regarding Claimant's limited range of motion (R. 337, 404, 420) and the severity of Claimant's degenerative disc disease of the cervical spine (R. 412, 426). However, the ALJ's finding that these treatment notes contain largely unremarkable physical findings is supported by the record. (R. 350-53, 356-59, 406-11). Dr. Ferguson's treatment notes further indicate Claimant was treated conservatively with medication (R. 350-58, 402-45) and that surgery was not warranted (R. 436). The examination findings of other physicians also indicate some limitations, but not to the level indicated by Dr. Ferguson's opinions.

14

(R. 400, 447, 449, 457-58). On April 4, 2012, Dr. Casazza at the University of North Carolina ("UNC") saw Claimant in consultation for evaluation of his back pain, and on musculoskeletal examination he found Claimant's C-spine, L-spine, and lumbar paraspinal muscles were tender to palpation, but Claimant had normal bulk and tone and a full range of motion at his upper and lower extremities. (R. 446-47). In follow up on April 19, 2012, Dr. Casazza noted that an MRI of Claimant's cervical spine indicated degenerative changes from C3-4 to C7-T1 and disk bulges at multiple levels, but without any significant central canal stenosis, and there were no other significant abnormalities noted. (R. 449). Dr. Casazza noted that he "explained this to [Claimant] at length," discussed the importance of not wearing a soft cervical collar as much as possible, and recommended physical therapy for Claimant's neck and low back problems. (R. 449). Thus, although there are several notations of Claimant wearing a neck brace or soft collar, *see, e.g.*, (R. 350, 356, 402, 404), and he testified to a limited ability to move his neck (R. 88-91), he was also told to try to stop using the collar and conservative treatment was recommended (R. 358, 446, 449).

With respect to Claimant's activities of daily living, the ALJ noted that Claimant reported "tending to his personal care, performing some yard work and shopping," being able to drive independently, and taking care of two pet dogs that were active, citing the function report completed by Claimant and his testimony at the administrative hearing. (R. 66). A review of these sources reveals that Claimant indicated he showers, but his wife helps him dress, he is unable to cook or do yard work with the exception of sometimes trying to water the flowers outside when he feels "ok," he drives to doctor's appointments and to the store every two to three weeks to look around for about an hour, and his wife feeds the dogs and he only opens the door when they need to go outside. (R. 81-83, 296-99). However, despite inconsistencies in the ALJ's characterization of Claimant's self-

15

reported activities and the record, there is other evidence in the record that Claimant was more active than he claimed. For example, a June 22, 2011 treatment note indicates Claimant was "working out but has slowed down" (R. 352), and a March 16, 2012 treatment note indicates Claimant reported lower back pain after walking on the track (R. 440, 446) and lifting a heavy car battery (R. 452).

The court "must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence." *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015) (unpublished) (citing *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012)). Where a treating physician's opinion is inconsistent with his own treatment notes and other evidence of record, as is the case here, the ALJ may give the opinion limited weight. *Id.* at 269 (citing *Meyer v. Colvin*, 754 F.3d 251, 256 (4th Cir. 2014)); *Craig*, 76 F.3d at 590. Although, as discussed above, there is some evidence in the record supportive of Dr. Ferguson's opinions, there is more than a "scintilla of evidence" supporting the ALJ's decision to afford little weight to these opinions. *Dunn*, 607 F. App'x at 271 (concluding the ALJ did not err in affording limited weight to a treating source opinion where "there is more than a 'scintilla of evidence' in the record supporting the ALJ's conclusion that [the physician's] opinion is incongruent with both his own treatment notes and some of the other medical evidence in the record."). Accordingly, the ALJ did not err in evaluating Dr. Ferguson's opinions.

## 2. Consultative Examiner's Opinion

On May 12, 2011, David C. Johnson, M.A., a licensed psychological associate, performed a consultative psychological evaluation of Claimant, which was co-signed by Dr. Edward Crane, Ed.D., a licensed psychologist. (R. 345-48). After summarizing Claimant's history and self-reported activities of daily living, Johnson noted Claimant was "active and responsive in the evaluation" and "[t]here may be a tendency to exaggerate some symptoms." (R. 346). Claimant reported feeling

16

nervous and anxious, but mainly depressed. *Id.* In summary, Johnson concluded as follows:

[Claimant] would have difficulty adjusting adequately in a job setting given his presentation today. He seems somewhat depressed and he may have some underlying anxiety as well. The degree his numerous medical problems affect his ability to work needs to be determined by a physician. Judgment and math ability are deemed adequate for managing benefits appropriately in his best interest. A mental health referral is recommended as he endorses symptoms of anxiety and depression in particular.

(R. 348). The ALJ discussed the opinion as follows:

On May 14, 2011, David C. Johnson, M.A., a licensed psychological associate, performed a comprehensive clinical psychological evaluation on the claimant. The claimant drove to the appointment, which was in Hope Mills, North Carolina. The drive took roughly thirty minutes. The mental examination revealed intact reality contact. The claimant reported feeling depressed due to pain and situational stressors. His affect was flat, and he denied homicidal or suicidal ideations. His associations were noted as tight. Mr. Johnson noted that the claimant did not present with significant maladaptive personality characteristics. Mr. Johnson believed that the claimant may have mild impairment of judgment at times. He also believed that the claimant appeared to be functioning within the low average range of intelligence and estimated the claimant's IQ at 83 to 93. Mr. Johnson diagnosed the claimant with mood disorder and depression. The claimant attained a GAF of 50-60. Mr. Johnson stated that the claimant would have difficulty adjusting adequately in a job setting, given his presentation during the evaluation (Exhibit B3F).

(R. 69). The ALJ also generally discussed the Global Assessment Functioning ("GAF") scale and

assigned little weight to the GAF score assessed by Johnson. (R. 70). Aside from this analysis of

the GAF score, the ALJ did not weigh or further analyze Johnson's opinion (R. 69-70), and the

failure to do so was error. Nevertheless, the court finds the error to be harmless.

The ALJ specifically discussed the opinion of Johnson and, thus, it is evident he considered

it in rendering the decision. (R. 69-70). Johnson opined that Claimant "would have difficulty

adjusting adequately in a job setting given his presentation today," noting that he "seems somewhat

depressed and he may have some underlying anxiety as well." (R. 348). Although Claimant was

17

treated by Dr. Ferguson with medication for anxiety, there is no evidence he sought or received treatment from a mental health provider and there is no indication in Dr. Ferguson's treatment notes that Claimant's anxiety or depression were so severe as to prevent him from working. Furthermore, in the ALJ's RFC, he accounted for Claimant's depression and anxiety by limiting Claimant to simple, routine, repetitive tasks in a low production environment with no complex decision making, constant change, or dealing with crisis situations, and frequent, but not constant, contact with co-workers and the general public. (R. 68). Finally, the *Tomlin* case cited by Claimant is distinguishable on three material grounds: the opinion at issue in *Tomlin* was that of a treating physician, nowhere in the ALJ's decision was the opinion discussed, and the opinion ran counter to the ALJ's determination. *Tomlin v. Colvin,* No. 5:13-CV-276-D, 2014 WL 4162402, at *5-6 (E.D.N.C. July 17, 2014) (unpublished), *adopted by* 2014 WL 4162783 (E.D.N.C. Aug. 20, 2014). Here, Johnson is a consultative examiners with no longitudinal treatment relationship to Claimant, the ALJ did in fact discuss the opinion, and it is apparent that the ALJ gave some weight to the opinion where he imposed limitations in the RFC to address Claimant's anxiety and depression, so that further consideration of the opinion would not change the result. Accordingly, the failure to expressly assign weight to Johnson's opinion is harmless error.

## B. Credibility Determination

Claimant contends the ALJ improperly evaluated Claimant's credibility. Pl.'s Mem. [DE-18] at 13-15. Specifically, Claimant argues that the reasons given by the ALJ for discounting Claimant's credibility are not supported by the record. *Id.* The Commissioner contends the ALJ correctly evaluated Claimant's credibility. Def.'s Mem. [DE-20] at 19-22. The court agrees with the Commissioner that the ALJ's credibility determination was in accordance with the law and supported

18

by substantial evidence.

When assessing a claimant's RFC, it is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.") (citation omitted). Federal regulations 20 C.F.R. §§ 404.1529(a) and 416.929(a) provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593-94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. S.S.R. 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes this first determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. S.S.R. 96-7p, 1996 WL 374186, at *2; *Hines*, 453 F.3d at 564-65. Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors "concerning the individual's functional limitations and restrictions due to pain and other symptoms." S.S.R. 96-7p, 1996 WL 374186, at *3 (showing the complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence. *See Craig*, 76 F.3d at 595-96. But neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire

19

case record." S.S.R. 96-7p, 1996 WL 374186, at *2; *see also Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at *4-8 (E.D.N.C. Mar. 23, 2011) (unpublished) (finding the ALJ properly considered the entire case record to determine that claimant's subjective complaints of pain were not entirely credible), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

The ALJ accurately summarized Claimant's testimony at the administrative hearing regarding his impairments and limitations, but found Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms not entirely credible "to the extent they are inconsistent with the above residual functional capacity assessment." (R. 68-69). As an initial matter, the Fourth Circuit in *Mascio v. Colvin*, No. 13-2088, 2015 WL 1219530, at *5 (4th Cir. Mar. 18, 2015), criticized the use of the quoted language to explain the ALJ's assessment of a claimant's credibility. The Fourth Circuit reasoned that the boilerplate language "'gets things backwards' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility.'" *Id.* (quoting *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). However, the Fourth Circuit also indicated that "[t]he ALJ's error would be harmless if he properly analyzed credibility elsewhere." *Mascio*, 2015 WL 1219530, at *6. Here, the ALJ went on to give specific reasons why he found Claimant to be only partially credible, explaining that "[t]he medical evidence of record reveals relatively routine and conservative treatment for the claimant's impairments" and "[d]espite the claimant's alleged severity levels, examinations and treatment notes are generally unremarkable." (R. 69, 70-71). The ALJ also considered Claimant's testimony that he was unable to afford treatment, but found no support in the record that Claimant was refused treatment due to an inability to pay or had been turned away from facilities providing care to indigent patients. (R. 71). Therefore, the ALJ having explained his reasoning for discounting Claimant's credibility, the court

20

must determine whether the given reasons are supported by substantial evidence.

Claimant takes issue with the ALJ's finding that Claimant's conservative course of treatment was not related to an inability to afford treatment. Pl.'s Mem. [DE-18] at 14-15. A conservative course of treatment may be considered by an ALJ in evaluating a claimant's credibility. *Dunn*, 607 F. App'x at 273 ("[T]his Court has long held that it is appropriate for the ALJ to consider the conservative nature of a plaintiff's treatment—among other factors—in judging the credibility of the plaintiff."). Claimant testified to not being able to afford certain testing or surgical intervention. (R. 82-90). Claimant also points to a treatment note from November 2011, indicating he had been referred to neurosurgery for evaluation but was unable to have further testing due to self-pay status and that Claimant could return for further evaluation if he was approved for Medicaid (R. 400-01); an emergency room note from March 2012, indicating Claimant had not been admitted to charity care and notifying him of the wait list protocol for self-pay patients (R. 459-60); and that in July 2013, after he received charity care, testing of his legs revealed listing level peripheral vascular disease ("PVD") that explained Claimant's severe leg and foot pain (R. 19, 30-32). Pl.'s Mem. [DE-18] at 14.

There are references in the record to Claimant's self-pay status and attempts to receive indigent care, and Claimant testified to not being able to afford certain treatment, specifically related to his neuropathy which causes a severe burning sensation in his feet, later diagnosed as PVD. (R. 19-49, 85, 89, 441, 459-62). A treatment note from a pain clinic on November 9, 2011, states that Claimant "does not require routine visits in our clinic for medication refills at this time, especially due to self-pay status" and "[i]f Disability or Medicaid status is approved, patient may return to our office for further evaluations which are likely necessary." (R. 401). However, the record

21

demonstrates that Claimant continued to receive treatment from other sources.

Claimant visited Dr. Ferguson monthly for treatment. (R. 79-80, 402-06, 428-45). Claimant testified and the record demonstrates that Claimant also received consultative examinations and testing from UNC on a charity basis. A March 16, 2012 treatment note from Dr. Ferguson indicates Claimant was referred to the UNC Spine Center as a "charity" case. (R. 441). On March 19, 2012, Claimant presented to the emergency room and the notes from a neurosurgical consult with Drs. Blatt and Jaikumar indicate Claimant would be referred for a "PM&R spine evaluation" with a new MRI at that time "to allow the patient and his wife time to apply for charity care." (R. 459). A note the following day denotes Claimant as a "self-pay" patient and indicates he was added to the wait list and notified of the wait list protocol. (R. 460). On April 3, 2015, Claimant was seen by Dr. Casazza at UNC, in consultation at the request of Dr. Jaikumar, for evaluation of back pain. (R. 446-48). An MRI was ordered (R. 447), and an April 13, 2012 treatment note from Dr. Ferguson indicates Claimant had a "charity" MRI scheduled at UNC (R. 438). Claimant underwent the MRI on April 14, 2012. (R. 467-68). On April 19, 2012, Claimant saw Dr. Casazza in follow-up and was advised to talk to Dr. Ferguson about a referral to UNC Neurology regarding the burning in Claimant's hands and feet, which Dr. Casazza believed was possibly related to peripheral neuropathy. (R. 449-50). Claimant testified that he was told to request a referral to UNC Neurology from his primary care doctor, and that he obtained the referral and had an appointment for a nerve conduction study, which required payment of $375.00. (R. 85). Dr. Ferguson's treatment note from May 11, 2012, indicates he referred Claimant for "NCS" (presumably a nerve conduction study) (R. 436-37), but Claimant testified the appointment was cancelled because he had no insurance and was self-pay (R. 85). Notes from UNC Health Care dated May 23 and 31, 2012, indicate that a

22

neurological referral request was received, but declined. (R. 461-62). However, Dr. Ferguson's treatment note from July 6, 2012, indicates Claimant stated his peripheral neuropathy was resolved and his "feet are no longer on fire." (R. 430). Dr. Ferguson's subsequent treatment note on August 8, 2012, makes no mention of Claimant's neuropathy. (R. 428-29).

Finally, Claimant notes that in July 2013, after he received charity care, testing of his legs revealed listing level PVD, which explained his severe leg and foot pain. (R. 19, 30-32). However, Claimant presented those records to the Appeals Council in support of a request to file a new claim, indicated the records related to new conditions, and acknowledged the records would not be considered in relation to the review of Claimant's present claim. (R. 17); *see also* (R. 335) ("[T]he claimant has continued to decline in his condition and medical records have been provided to the Appeals Council previously. This information was sent not to be considered 'new and material' for the period prior to the ALJ denial, but to show that the claimant has significant new evidence and should be granted permission to file a NEW claim while his case is under review at the Appeals Council."). Furthermore, these new records reflect that on July 24, 2013, Claimant reported to Dr. Donohoe that while he had been having difficulty with pain in his lower extremities for the past two to three years, it was "fairly well tolerated, and managed with some increase in his pain regimen" by Dr. Ferguson. (R. 30). Claimant also indicated that in the past several months, the pain had "gotten significantly worse." *Id.* The evidence on which Claimant relies is not material to the claim at issue in this case and does not demonstrate that Claimant, due to his indigent status, failed to receive testing or treatment related to conditions at issue at the time of the ALJ's decision. Accordingly, the ALJ did not err in concluding that Claimant's conservative treatment was not due to the denial of testing or treatment based on his indigent status or in finding Claimant's testimony

23

regarding the severity of his symptoms and limitations less than credible based on Claimant's conservative course of treatment.

With respect to Claimant's activities of daily living, as explained above in the court's analysis of the medical opinion evidence, *see supra* section V.A.1, while there is some discrepancy between the ALJ's characterization of Claimant's activities of daily living and the record (R. 66, 81-83, 296-99), there are other indicia in the medical records that Claimant was more active than he claimed (R. 352, 440, 446, 452). Furthermore, as discussed *supra* in section V.A.1, the ALJ correctly noted that examinations and treatment notes, while they indicate Claimant had some limitations, are generally inconsistent with the severe limitations reported by Claimant. (R. 70, 350-53, 356-59, 400, 406-11, 446-47, 449, 457-58). Accordingly, even disregarding the ALJ's discussion of Claimant's activities of daily living, the ALJ provided additional reasons, supported by substantial evidence, for finding Claimant less than fully credible.

## C.    RFC Determination

Claimant contends the ALJ improperly evaluated Claimant's RFC. Pl.'s Mem. [DE-18] at 15-16. Specifically, Claimant argues that the ALJ failed to specify the frequency of Claimant's need to alternate between sitting and standing in the RFC in violation of S.S.R. 96-9p. *Id.* The Commissioner contends that S.S.R. 96-9p does not apply or, alternatively, that the ALJ complied with its requirements by consulting a VE. Def.'s Mem. [DE-20] at 23.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from

24

alleged symptoms. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also* S.S.R. 96-8p, 1996 WL 374184, at \*5. Where a claimant has numerous impairments, including non-severe impairments, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments.") (citations omitted). The ALJ has sufficiently considered the combined effects of a claimant's impairments when each is separately discussed by the ALJ and the ALJ also discusses a claimant's complaints and activities. *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96-8p, 1996 WL 374184, at \*7.

An ALJ's RFC assessment must specify the frequency of the individual's need to "alternate between sitting and standing." S.S.R. 96-9p, 1996 WL 374185 at \*7 (July 2, 1996). Specificity is not required, however, where the RFC finding and the hypothetical are "consistent with an 'at-will' sit/stand option." *Ruff v. Colvin*, No. 1:12-CV-165, 2013 WL 4487502, at \*7 (W.D.N.C. Aug. 20, 2013) (unpublished) (citing *Thompson v. Astrue*, 442 F. App'x 804, 807 (4th Cir. 2011) (unpublished)). The ALJ's silence regarding the frequency of the claimant's change of positions can reasonably be interpreted as "'as needed,' or otherwise at a claimant's own volition." *Id.* at \*7 (citing *Wright v. Astrue*, No. 1:09-CV-0003, 2012 WL 182167, at \*8 (M.D.N.C. Jan. 23, 2012) (unpublished)).

Here, the ALJ's RFC and hypothetical to the VE indicated that the sit/stand option was

25

defined as being able to perform the employer's tasks while sitting or standing. (R. 68, 92-93). This determination is consistent with an "at-will" sit/stand option, and Claimant has pointed to no evidence suggesting otherwise. *See Hedspeth v. Astrue*, No. 2:11-CV-00038-FL, 2012 WL 4017953, at *5 (E.D.N.C. Sept. 12, 2012) (unpublished) (finding the ALJ did not err by failing to tell the VE how often plaintiff needed to alternate between sitting and standing) (citing *Thompson*, 2011 WL 3489671, at *2 (finding that, despite claimant's argument that the ALJ had failed to specify the frequency with which she needed to alternate sitting and standing, the ALJ's RFC finding and hypothetical were consistent with an "at will" sit/stand option and that no greater specificity was required); *Wright*, 2012 WL 182167, at *8 (finding the ALJ's inclusion in hypothetical of "sit/stand" option sufficient because its "at will" nature was reasonably implied); *Pierpalio v. Astrue*, No. 4:10-2401-CMC-TER, 2011 WL 7112913, at *6 (D.S.C. Dec. 15, 2011) (unpublished) ("at will" indication sufficient to satisfy requirement of frequency)). The VE specifically identified jobs in substantial number, factoring in a 75 percent reduction in the available positions, that could accommodate the use of a chair or stool at the work station or a sit/stand option. (R. 93). Additionally, the court agrees with the Commissioner that S.S.R. 96-9p applies only to individuals who retain the RFC for less than a full range of sedentary work and is not implicated here where Claimant was found to have the capacity to perform a limited range of light work. *Hedspeth*, 2012 WL 4017953, at *5 (citing S.S.R. 96-9p; *Kestler v. Astrue*, No. 2:10-CV-00220-DNF, 2011 WL 4005898, at *10-11 (M.D. Fla. Sept. 9, 2011) (unpublished) (finding S.S.R. 96-9p inapplicable in context of RFC for light work)). Accordingly, the ALJ did not err by imposing a sit/stand option without providing a specific frequency, where the sit/stand option is consistent with an "at-will" limitation and S.S.R. 96-9p does not apply.

## D. Medicaid Decision

Claimant contends the Appeals Council erred in failing to consider Claimant's favorable Medicaid decision, which was dated July 24, 2013, seven months after the ALJ's decision. Pl.'s Mem. [DE-18] at 16-19. The Commissioner contends that the ALJ was under no duty to consider the evidence submitted to the Appeals Council, including the Medicaid decision, because it pertained to an impairment post-dating the ALJ's decision. Def.'s Mem. [DE-20] at 24-25. The court agrees with the Commissioner that the Appeals Council did not err in failing to consider the favorable Medicaid decision.

The Appeals Council must consider evidence submitted by a claimant with his or her request for review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991), *superseded on other grounds by* 20 C.F.R. § 404.1527; 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1) ("The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision."). Evidence is new if it is not duplicative or cumulative, and material if there is a "reasonable possibility that the new evidence would have changed the outcome of the case." *Wilkins*, 953 F.2d at 96; *see also Nance v. Astrue*, No. 7:10-CV-218-FL, 2011 WL 4899754, at *4 (E.D.N.C. Sept. 20, 2011) (unpublished) (explaining that at this stage, Claimant bears the burden of demonstrating that additional evidence is new, material, and relates to the time period before the ALJ's decision) (citations omitted), *adopted by* 2011 WL 4888868 (E.D.N.C. Oct. 13, 2011).

As discussed above, *see supra* Section V.B, the Medicaid decision and other medical records

27

were submitted to the Appeals Council not in connection with the application at issue here, but rather for the purpose of seeking an expedited ruling so that Claimant could submit a new application regarding new conditions. (R. 17, 335). The court declines to find the Appeals Council erred in failing to consider evidence that was presented for the express purpose of filing a new application and not in support of Claimant's current claim. Moreover, aside from the letters to the Appeals Council indicating the records related to new conditions, medical records from July 24, 2013, also indicate Claimant's lower extremity pain for the past two to three years had been "fairly well tolerated, and managed with some increase in his pain regimen" by Dr. Ferguson, but had "gotten significantly worse" over the past several months (R. 30), and thus postdates the period relevant to Claimant's present claim before the court. Accordingly, this evidence is not material to the claim at issue in this case, and the Appeals Council did not err in failing to consider the Medicaid decision.

## VI. CONCLUSION

For the reasons stated above, Claimant's Motion for Judgment on the Pleadings [DE-17] is DENIED, Defendant's Motion for Judgment on the Pleadings [DE-19] is ALLOWED, and the final decision of the Commissioner is upheld.

SO ORDERED, this the **23** day of September 2015.

Robert B. Jones, Jr.
United States Magistrate Judge

28